# Commonwealth v. Hartman, Appellant.

*Criminal law—Indictment—Conspiracy—Election laws.*

Nine persons were indicted for a conspiracy to violate the election laws. Three of these at the time of the indictment were fugitives from justice. For an irregularity at the preliminary hearing the bill was quashed as to all. the defendants except the three fugitives; as to the latter the bill stood. In the meantime one of the other defendants died. A new indictment was then found for the same offense against the five living persons as to whom the first bill had been quashed. At the trial the court made an order that all of the defendants under both bills of indictment should be tried together before the same jury. *Held*, that the order was proper.

*Criminal law—Crime against the ballot—Opening ballot box.*

On the trial of an indictment for a conspiracy against election laws a ballot box, when properly identified, may be opened, and for this purpose a commissioner may be appointed to open the box in the presence of the district attorney and counsel for defendants so as to sort and arrange the contents of the box in such order that they could more rapidly and conveniently be inspected by the jury.

On the trial of such an indictment where it appears that certain of the defendants made a violent attempt to seize a window book, and that one of the defendants asked the watcher whether he intended to put it out of sight, such book may be offered in evidence against the defendants.

At a criminal trial a witness against the defendant may be asked if there existed any quarrel or ill feelings between himself and the defendant, and if he answers this in the negative, the defendant may contradict the witness, but he cannot testify as to the origin or subject-matter of the alleged quarrel.

Argued March 15, 1906. Appeal, No. 238, Jan T., 1906, by defendant, from judgment of Q. S. Phila. Co., Nov. T., 1905, No. 156, and Aug. T., 1905, No. 757, on verdict of guilty in case of Commonwealth v. Thomas H. Hartman, Jr., et al. Before RICE, P. J., PORTER, HENDERSON, MORRISON, OR-LADY, HEAD and BEAVER, JJ. Affirmed.

Indictment for conspiracy. Before WILTBANK, J.

The facts are stated in the opinion of the Superior Court.

Verdict of guilty upon which judgment of sentence was passed.

were (1) in making the order as to the trial; (2, 3) in appointing a commissioner to open the ballot box;

(4, 5) in permitting the ballot box to be opened; (6) in admitting in evidence the window book; (8) in refusing to permit the defendant to show the cause of animosity of the witness Woehlcke.

*William T. Connor*, with him *John R. K. Scott* and *J. Joseph Murphy*, for appellants, cited as to the order: State v. Devlin, 25 Mo. 174.

Cited as to the rulings on evidence: Kneass' Case, 2 Parson's Select Equity Cases, 553; McCullough's Election, 12 Phila. 570; Preserving Co. v. Miller, 52 Conn. 444; First Nat. Bank of DuBois v. Bank, 114 Pa. 1; Edwards v. Gimbel, 202 Pa. 30; Hottle v. Weaver, 206 Pa. 87.

Cited as to the prejudice of the witness Woehlcke: Com. v. Payne, 205 Pa. 101; Com. v. Farrell, 187 Pa. 408.

*Chester N. Farr, Jr.*, assistant district attorney, with him *John C. Bell*, district attorney, for appellee, cited as to the order: Com. v. Dupes, 14 Pa. C. C. Rep. 238; Withers v. Com., 5 S. & R. 59.

Cited as to the opening of the ballot box: In re Massey, 45 Fed. Repr. 629; State v. Shay, 101 Indiana, 36; Com. v. Brangan, 10 Pa. Dist. Rep. 739; In re Election of Councilmen in 20th Wd., 2 Pa. Dist. Rep. 635; People v. Londoner, 13 Colo. 303 (22 Pac. Repr. 764); Hudson v. Solomon, 19 Kansas, 177; Bertolet's Case, 3 Pa. Dist. Rep. 643.

OPINION BY HEAD, J., June 30, 1906:

During the summer of 1905, an information was made charging nine persons, to wit: Otto F. Kurz, William Reagan, Charles Judge, Benjamin Williams, E. M. Gunkle, Thomas H. Hartman, Jr., Edward McCaffrey, Charles Kane and John Falvey, with a conspiracy to violate the election laws of the state, by the receipt and computation of a large number of false and fraudulent ballots at the preceding spring election, and the making of a false and fraudulent return of the result of said election in a certain precinct of the city of Philadelphia. Three of those so charged, viz.: Reagan, Falvey and Kane, were not arrested, it being alleged they were fugitives from justice. The remaining six were arrested, had a hearing before a magistrate

and were held to bail to appear at the next term of the court. To No. 757 of the August sessions of that court, a bill was presented to the grand jury formally charging the nine persons above named with the conspiracy already referred to, and was returned a true bill as to all of them, permission of the court having been first applied for and obtained to present the bill as to the three persons who, as already stated, were fugitives. The preliminary hearing had been held by the committing magistrate, not in the regular magistrate's court, but in the private law office of the magistrate in a part of the city outside the territorial limits of his jurisdiction. For this reason a motion to quash the bill was, after argument, sustained by the court and the bill was quashed as to all of the defendants except the three fugitives; as to them the bill stood. Meantime, Edward McCaffrey, one of the defendants, had died. A new information was then made against the five living persons as to whom the bill had been quashed, they were rearrested, had a hearing, were again held to bail for court, and to No. 156 of November sessions, a bill was again presented to and found by the grand jury, charging these five with having conspired with the three already indicted under the former bill, to commit precisely the same offenses charged against the entire nine in the earlier bill. When the time for trial came the record thus showed that eight persons stood indicted before the court, charged with having participated in one and the same act of conspiracy to accomplish one and the same object, or, in other words, with the commission of a single crime; but, by reason of the technical error of the magistrate and the action of some of the defendants consequent thereon, under two bills of indictment instead of one as the commonwealth intended they should be. On motion of the district attorney, and against the objection of the appellant, the learned trial court made an order that all of the defendants under both bills of indictment should be tried together before the same jury, and that order is the error alleged in the first assignment.

As it seems to be agreed we have neither statute nor precedent to give us the aid of authority in disposing of the question now before us, we must turn to the general principles on which our system of criminal law rests, and to the decisions of our courts in cases more or less analogous to the present one, and

from a study of these determine whether or not the action of the court below was in harmony with these principles and in line with these decisions. A natural and orderly course of procedure would seem to require that all who are charged to have joined in the commission of a single offense should be tried together. This should be true even where the offense is of such a character that it could be committed by a single person; and a fortiori should it be true where the crime charged can be consummated only by the concerted action of several. Where it is alleged that a number of persons, for the purpose of striking a more effective blow against the state, have voluntarily bound themselves together in such an intimate union that the hand and voice of each become the hand and voice of all, there should be no just ground of complaint that the union, so claimed to have been created by themselves, is recognized and insisted upon by the state when the time to answer for their acts arrives. This conclusion would not be denied had there been but a single indictment. Is there anything in the naked fact that, in this case, it required two bills of indictment to bring all of the defendants regularly before the trial court, which necessarily deprived the commonwealth of the right it would have otherwise had to have tried all of the alleged conspirators together? The power to weld together, at a proper time and under proper circumstances, two proceedings begun separately is, in essence and substance, precisely the same power which separates, under like conditions, a single proceeding into two or more. Such power must be lodged somewhere, and reason and authority unite in designating the trial court as the proper repository of this power and in declaring that it should be exercised or withheld as a sound judicial discretion would determine on the facts of each particular case.

Where two or more defendants have been jointly indicted in one bill, the right to sever them in their defense and permit separate trials, upon proper showing, has been often and freely exercised by trial courts, and is beyond question. But the offense of conspiracy is so peculiar in character and so strongly does the law incline to the natural conclusion that co-conspirators should be tried together, that an application for a severance in such a case, was refused by an eminent judge, even

· when based on reasons that would have ordinarily prevailed: Commonwealth v. Manson, 2 Ashmead, 31. We are not to be understood, however, as holding that in no case of conspiracy may a severance properly be allowed. So the correlative power to consolidate two indictments for conspiracy and try them as one before a single jury was held to have been properly exercised by the trial court in Withers v. Com., 5 S. & R. 59. In that case the bills charged separate and distinct offenses, but the defendant was the same. Here the defendants are different, but the crime charged in both bills is but one and the same. In that case GIBSON, J., says: "In the present case the prisoner was allowed his challenges on each indictment and has, therefore, no ground for complaint. But, had it been otherwise, we could view these two charges only as if they had been included in the same indictment." So we find the general rule thus laid down in 4 Ency. Pl. & Pr. page 733: "Conspirators are generally tried jointly, yet such is not the invariable practice." We conclude, therefore, that the only real question raised by the first assignment of error is whether or not there was any abuse of power by the learned trial court. Inasmuch as it has not been made to appear that any right, secured to the appellant by our constitution or laws, has been impaired or taken away by the consolidation of the two bills, we can find no tangible ground upon which to convict the court below of error, and the first assignment must be overruled.

Numerous objections were made to the rulings of the court directing the ballot box to be opened and permitting its contents to go to the jury as evidence. It is contended that the identity of the box was not sufficiently proven and that the commonwealth should have been required to show affirmatively that it had not been tampered with in the time intervening between the election and the trial. The testimony showed that shortly after midnight on the night of the election the box from the 12th division of the 14th ward was regularly delivered in the usual way at city hall and, along with others, was placed in a vault devoted to that purpose. The vault was protected by two doors, each having its own key.

One of these keys was placed in the custody of the mayor or one of his deputies, the other of the prothonotary. When the court ordered the production of the box the vault was

opened and the box found in its proper place, with a tag indicating that it was the ballot box of the particular division and ward under investigation. True, the evidence failed to show who wrote the inscription on the tag and there was no attempt made to prove the negative which, it is now argued, should have been established before opening the box, or that it had not been tampered with by anyone after being placed in the vault. This would have been obviously impracticable. Besides, when the box was actually opened and the defendants, who were election officers, were confronted with the records therein contained, signed by themselves and corresponding in all respects with the duplicates from the prothonotary's office, previously offered in evidence, no possible doubt could remain as to the identity of the box, or that its contents were other than as they had been left by the conspirators on the completion of their work.

It is also alleged that the court erred in directing that the box be first opened by a commissioner appointed for that purpose. In what way the appellant was or could have been prejudiced by this order is not made to appear. It did not result in the submission to the jury of any secondary evidence as to the contents of the box, but only in the sorting and arranging of those contents in such order that they could be more rapidly and conveniently inspected by the jury during the trial. This was done in the presence of the district attorney and counsel for defendants. To thus facilitate the labors of the jury in ascertaining the contents of the box when it was offered in evidence and opened in their presence, violated no rule of law or evidence. It infringed upon no right secured to the defendants. It left them precisely where they would have been had the jurors been compelled to expend the time and labor necessary to do for themselves the preliminary work done by the commissioner. None of the assignments of error on this subject can be sustained.

During the trial the court permitted the commonwealth, against the objection of the defendants, to offer in evidence the "window book" kept by the witness Monaghan. He was the properly accredited "watcher" of one of the political parties, duly appointed under the provisions of the act of June 13, 1893. He was supplied with a book, commonly known as a "window

book," containing the name and residence of each elector entitled to vote in that precinct.   By the aid of this book, properly kept during the day, the witness would be able to testify, not only to the entire number of ballots actually cast, but to the names of the persons who had cast them, if that became a material inquiry, as it certainly was in the present case.   It is earnestly argued, however, that even in such an inquiry the " window book," which was but a written memorandum, kept by the witness himself, of what transpired, could not properly be offered as an independent piece of testimony, although it is conceded the witness might use it to refresh his recollection as to names, dates, etc.   Were there nothing else in the situation to warrant the admission in evidence of the book itself, the force of this argument would be apparent.   But there was evidence that another watcher, the witness Woehlcke, had been forcibly ejected from the polling place about forty minutes before the election closed.   Just before this occurrence one of the defendants, Falvey, made a determined effort to secure the book kept by that watcher.   " Then he (Falvey) made a grab for the book and tore a part of it, but Woehlcke retained the bigger portion of it."   (App. page 214.)   Monaghan retained his book until the work of the board was about finished, showing not only 372 ballots in the box as against 172 actually cast according to his book, but also the preparation of the voting lists, tally lists, etc., to make them correspond, when the following occurred (App. page 217) :  " Q. Did anybody say anything to you about that window book during the day ?   A. Yes, sir; about the time they were making out the outside statement of the returns, Mr. Hartman came to me and asked me what I intended to do with my window book ; whether I intended to put it out of sight.   I said, ' I will let you know when we get everything straightened out.' "

The appellant, Hartman, who made that inquiry, was himself a watcher at that election, and kept or aided in keeping his own window book.   He must thus have known what the book about which he inquired would, if honestly kept, reveal, and if then actually contemplating or engaged in committing the crime, of which he was afterwards convicted, his anxiety to suppress the book would be easily understood.   The jury could not gather the full force and significance of the question unless they had

before their eyes the very book and its contents which were in the mind of the appellant when he asked it. The book was so much a part of the statement made by the appellant that it could not be withheld from the jury without weakening the force of the statement itself, which was clearly competent evidence. For this reason we think the offer of the book was properly admitted.

When the witness Woehlcke was on the stand he was asked if there existed any quarrel or ill feeling between himself and the defendant Hartman. He replied in the negative. Certainly it was competent for the defendant to show any bias on the part of the witness against any of the defendants, and Hartman was permitted properly to contradict the witness and assert that there was a quarrel between them. In the fact that a quarrel existed, if such were the fact, the jury were interested, as that might warrant the inference that the testimony of one or both of the parties to it was colored by feeling. But they had no interest whatever in the origin or subject-matter of the alleged dispute. To have permitted the appellant to testify on these subjects would have opened up an entirely new and collateral issue, tending rather to confuse and obscure the material question than to aid in answering it, and the learned court was, therefore, right in rejecting such testimony.

A careful examination of the whole record and of the able argument of the learned counsel representing the appellant has failed to convince us that the latter was deprived of any substantial right during the trial, or that there was any error in the several orders and rulings complained of.

The appeal is dismissed at the costs of the appellant, the judgment is affirmed and the record is remitted to the court below with direction to have the sentence put into execution.