## Commonwealth of Pennsylvania *v.* Bonnem, Appellant.

Argued October 22, 1928.

Before HENDERSON, TREXLER, KELLER, LINN, GAWTHROP and CUNNINGHAM, JJ.

*Samuel W. Salus*, and with him *Francis Shunk Brown*, for appellant.—Evidence of persons other than the prosecutor was inadmissible to show the commission of a like act: Veit v. Class and Nachod, 216 Pa. 29; Huntzinger v. Harper, 44 Pa. 204. Defendant was charged with no indictable offense: Reed v. Felmlee, 25 Pa. Superior Ct. 37; Meredith v. National Bank, 275 Pa. 314.

*Michael A. Foley,* Assistant District Attorney, and with him *Charles Edwin Fox,* District Attorney, for appellee.—Evidence of persons other than the prosecutor, is admissible to show the commission of a like act: Commonwealth v. Griffin, 42 Pa. Superior Ct. 597. The motion to quash not made in time: Commonwealth v. Schoen, 25 Pa. Superior Ct. 211.

OPINION BY CUNNINGHAM, J., December 13, 1928:

Eight indictments were found in the Court of Quarter Sessions of Philadelphia County, in each of which Carl Bonnem and his father, Edward Bonnem, were charged with having conspired with each other and with "divers other evil disposed persons" to cheat and defraud the respective prosecutors named in the several indictments out of amounts varying in the different cases from $1,900 to $3,000 by fraudulently inducing them to invest these sums in various butcher shops and retail meat businesses, to be conducted, in partnership with the Bonnems, at specified locations in the city.

When the cases were called for trial on April 20, 1927, Carl Bonnem, the son, alone appeared and it was represented to the trial judge that Edward Bonnem was physically unable to go to trial. The Commonwealth, having been advised by a physician of its selection sent to examine the father that it would be dangerous and inadvisable to compel his appearance, elected to proceed to trial against Carl Bonnem. The legal effect of this procedure, in so far as the questions here involved are concerned, was the same as if Edward Bonnem had been granted a severance. Carl Bonnem was convicted upon seven indictments; his motions in arrest of judgment and for a new trial were denied; sentence was pronounced at the first number in the court below; and he has taken an appeal in each case. They were heard together and will be disposed of in one opinion. When these appeals

were called for argument at the October T., 1927, of this court, and we were advised that Edward Bonnem had not then been tried, we suggested that they were not ready for final adjudication in view of the anomalous situation which might arise if Edward Bonnem should be acquitted and it should appear from the record that the two Bonnems were the only persons implicated in the alleged conspiracy. Upon application of counsel for appellant the argument was continued pending the trial of the father. The suggested possibility no longer exists; it appears from a stipulation of counsel filed in this court that Edward Bonnem died September 18, 1928. At the continued argument at this term it was contended by the learned counsel for Carl Bonnem, that, entirely aside from the merits, he is entitled to have the judgment against him reversed and to be discharged from custody by reason of the death of Edward Bonnem before trial, because, as they contend, there can be no lawful sentence under any of these indictments for the conspiracy therein charged unless at least two persons have been convicted. We therefore now have two questions for consideration and disposition: one purely technical and the other on the merits.

1. In support of their position on the first question they rely chiefly on our case of Com. v. Faulknier et al., 89 Pa. Superior Ct. 454, but it is not authority for their present proposition. The situation there was quite different, both as respects the language of the indictments and the availability of the defendants for trial. The indictments in that case charged only two persons with the conspiracy; they were tried together and convicted; and the main question involved was the legality of granting a new trial to one and sentencing the other before the retrial of his single alleged co-conspirator. There were four indictments in all, two of which charged Faulknier, as a deputy constable,

with having extorted money from Lofstead and Eppolito, under arrest for violation of the liquor laws, and the judgments in these cases were affirmed. At the same time two other cases were tried, in one of which Faulknier was charged, along with one Bowman, with having conspired to extort the money from Lofstead and in the other, along with one Fiat, with conspiracy to extort the money from Eppolito. In these two conspiracy cases new trials were granted Bowman and Fiat, but Faulknier was sentenced. Upon a review of the conspiracy cases we reached the conclusion that the verdicts of guilty against Faulknier were valid but that as a new trial had been granted to his single alleged confederate in each instance the cases were not ripe for judgment against Faulknier. Judge Trexler, speaking for this court, pointed out that the indictments did not charge the defendants therein named with conspiring with others whose names were unknown and that the new trial should have been granted to both defendants in each indictment or refused to both, because, if Bowman and Fiat, or either of them, should be acquitted upon the retrial, the court would be confronted with the anomaly of having before it a single defendant convicted of a conspiracy under an indictment which charged only him and the acquitted defendant with the offense. We accordingly reversed the judgments against Faulknier for conspiracy, directing the verdicts to stand, and remitted the record so that the court below might suspend the sentences until it should properly appear that Bowman and Fiat, or either of them, have been convicted, when Faulknier should be again sentenced, or discharged in the event that both Bowman and Fiat should be acquitted. This was done in accordance with the principle that where a number of known persons are charged together by name with a crime like conspiracy or riot and are arrested and available for trial, but obtain severances, and on the separate trials verdicts

are returned against a fewer number than are capable in law of committing the crime, the judgments should be suspended until the number necessary to the crime have been convicted. In charges of conspiracy, it is a rule of caution against the possibility of the acquittal of all but one of the persons named in an indictment which undertakes to name all the conspirators. This principle does not apply where one alone is indicted for a conspiracy with others unknown, or where he is indicted with others who cannot be taken or brought to trial: 12 C. J. 644, Sec. 248. Here, the only other known defendant cannot be brought to trial. The rule followed in the Faulknier case has no application to a case in which the possibility it is intended to guard against has, for any reason, ceased to exist. Nor does the quotation from the opinion of President Judge PORTER in Com. v. Sanderson, 40 Pa. Superior Ct. 416, at page 484, that "the Commonwealth is not required to prove in a criminal case that all of the defendants charged are guilty, although in the case of conspiracy it must prove that two or more are guilty," support appellant's contention. In that case a severance had been granted to one of five defendants charged with conspiracy and the remark was made in that portion of the opinion in which it was pointed out that the Commonwealth, under such circumstances, was not required to prove the participation of the severed defendant. It is undoubtedly true that in every case of conspiracy the Commonwealth must charge and prove that at least two persons were implicated in the offense, but it does not follow that at least two must actually be brought to trial and convicted before sentence may be pronounced upon any. Under the authorities in this state it is not even required that alleged conspirators be jointly indicted. In Heine v. Commonwealth, 91 Pa. 145, Heine was indicted alone for conspiring with one Weill to defraud Heine's creditors. It was urged that the indictment

was defective in charging only one defendant with a joint offense. Upon this subject our Supreme Court said: "The objection is that Heine alone is charged; that a fraudulent conspiracy is in its nature joint, and that one alone cannot be guilty of this offense. This is strictly true; nevertheless, one of two or more conspirators may be separately indicted, tried and convicted: 3 Chit. Crim. Law, p. 1141. Therefore, that Weill has not been indicted with Heine can make no difference if it sufficiently appears, from the record, that he was a confederate."

In Com. v. Stambaugh, 22 Pa. Superior Ct. 386, the indictment charged two persons with a conspiracy: one was not arrested and the trial proceeded as to the other and the sentence pronounced against him was affirmed. In the course of the opinion our former President Judge ORLADY said: "The soundness of a separate trial of one so indicted is established by abundant authority: 2 Whar. Prec. Indcts. Sec. 607, note b; Heine v. Commonwealth, 91 Pa. 145." The principle is therefore well established in this state that one of two or more conspirators may be separately indicted and tried, or separately tried if jointly indicted, and, upon conviction, legally sentenced, if it appears from the record that there was a confederation between him and one or more other persons, and this although his confederate or confederates may not be available for, or ever brought to, trial. Our decisions are in accordance with the common law rule as stated in Rex v. Elizabeth Niccolls, 2 Strange 1227, 93 Eng. Reprints 1148, and Rex v. Scott and Hams, 3 Burr. 1262, 97 Eng. Reprints 822. In the first case the defendant was indicted for conspiring with Bygrave unjustly to charge one Frankland with a robbery. Bygrave died before the indictment was presented but the conviction of Elizabeth Niccolls was upheld. In the Scott and Hams case there was an indictment for riot against six: two died, two were

acquitted and two convicted. A motion in arrest of judgment was made on the ground that at least three must be found guilty of riot. In denying the motion Lord Mansfield said: "Six were indicted, two of them are acquitted; two are dead, untried. The jury have found these two to be guilty of a riot; consequently it must have been together with those two who have never been tried; as it could not otherwise have been a riot." In People v. Olcott, 2 Johnson's Cases 301 (N. Y.); 1 Am. Dec. 168, Olcott and Aborn were charged with conspiring with one Roe to defraud the Bank of New York. Roe died before the indictment was found, Aborn was acquitted and the jury disagreed as to Olcott. His application for discharge upon habeas corpus was denied. See also the note to Feder v. United States, 257 Fed. 694, 5 A. L. R. 370 at 373.

We, therefore, conclude that the death of Edward Bonnem, shown by the record to have been a confederate of appellant, can have no effect upon the judgment appealed from, if it is otherwise valid.

2. Upon the merits twelve assignments of error have been filed but a detailed discussion of them is unnecessary as they may properly be disposed of by considering the subject matter of each group. The principal contention is that the indictment does not properly charge the offense and the evidence is not sufficient to sustain the verdicts. The indictments are drawn substantially in the language of section 128 of the Act of March 31, 1860, P. L. 412, and we think sufficiently charge the defendants with a conspiracy to cheat and defraud the respective prosecutors: Com. v. Romesburg, 91 Pa. Superior Ct. 559. The record does not disclose any motion to quash. There was evidence from which the jury could reasonably find that from time to time the defendants inserted an advertisement in the Philadelphia newspapers for a partner in an established meat business, to join a party operating a branch store, and continuing:

"About $3,000 cash required. Salary $50 a week and share of profits. Experience not necessary. Partner to handle books and money." The prosecutors and several other persons, hereinafter referred to, answered the advertisement and, through various representations made by defendants, were induced, for an amount agreed upon in each case, to become partners in proposed butcher shops, to be rented and supplied with fixtures by defendants. The shops were opened, but, for one reason or another, each failed within a few weeks or months and the prosecutors lost their money. A typical case is that in which Harvey R. Howard was the prosecutor. After testifying that he went to defendants' home on Roosevelt Boulevard in response to the advertisement, he continued: "Q. Who was there when you called? A. Both Edward Bonnem and Carl Bonnem, and also the women folks of the house. ...... Q. What happened? A. I told them I had called there in answer to their ad., about them wanting somebody as a partner in the meat business, and they told me—tried to show me where I could get along very nicely better than working for somebody else, if I would put in $2,000 in this business, and get a share of the profits and receiving, they said, $50 a week as salary and an equal share, and they would supply all the meats and fixtures, and so forth, for the store. Q. They would supply the store, the meats, the fixtures, and you were going to get $50 a week for your share, and, of course, you were going to take that out of the profits, and 50 per cent of the profits? A. Yes. ...... And also January 7th they asked me for an additional loan of $500, they wished to purchase a truck, they said, to be used in this business. I haven't seen the truck, nor I have never seen the $500. Q. You put in $2,500 the first day you went there to their home—you entered into an agreement with them? A. I did. ...... Q. When was it that they got your check? A. We gave them

a check for $300 and the balance of $1,700 they got on January 4th, 1926. He came over to Jersey to get the cash, and I had my wife go to the bank at Moorestown and identify him."

Having related that the store was located at Glenside and that it was fitted up by the defendants as a new store, the witness gave this account of the termination of the partnership: "A. We went up there just before it opened. It opened up on January 22d. Q. He was going to teach you the business, I suppose? A. He [appellant] promised me he would be up there with me, and work right alongside of me and break me in and teach me the butcher business. Q. Who was going to buy the meats? A. He was going to buy the meats and look after things in general. Q. How long did you stay in the store? A. We were there, I guess, just about 10 days. Q. What happened at the end of 10 days? A. He just came around, and he says, 'Well, it looks pretty bad. If you care about putting in any more money, we've got a very good location further up.' He said I could have that if I put in another $500. He explained to me that he could get another location where he was quite sure the business would go better. Q. Further up? A. Yes, he would have one further up for me. Q. By the way, then what happened? A. So he said, 'Well, we might as well close.' In fact, every time him and his father came around they would throw up their hands and say, 'We've got to close this place, we've got to close this place.' That's all you would hear. So, at last he says, 'We can take a statement of the stock on hand at the present time,' and, in fact, he wrote it out and I signed it. It was the condition of the stock. I figured he would get in touch with me or make some arrangement about where we would dispose of the fixtures, or have a split of some kind that I would get something out of the wreck. Q. Did you ever get a nickel out of it? A. I got two weeks' pay, I think,

$50 a week. Q. Did you ever get any more of your $2,500 back? A. No, I never seen any more." A written partnership agreement under date of January 4, 1926, was signed by Howard and appellant, providing in substance that Howard should have a half interest in the store for $2,000, that the partnership should continue for the term of one year, and containing other details not material to the present inquiry. In addition to the prosecutors, the Commonwealth called several persons who had answered the same, or similar, advertisement and entered into partnerships with the defendants, and offered to show that they had been defrauded by the same methods as those described by the prosecutors. This evidence was admitted over the objection of counsel for appellant for the purpose, as stated by the learned trial judge, of showing "a systematic scheme to defraud, and the carrying out of that scheme in other cases, for the purpose of rebutting any defense of the absence of criminal intent." It has been repeatedly held that such evidence is admissible for the purpose indicated: Com. v. Pugliese, 44 Pa. Superior Ct. 361, 365; Commonwealth v. Camwell, 89 Pa. Superior Ct. 339, 345. Objection was also made to permitting the prosecutors to testify to what was said and done by the defendants prior to the execution of the various partnership agreements; the theory of the objection, as stated by counsel for appellant, was that all of these matters were merged in the written agreements. The court was not trying a civil action based upon the written partnership agreements, but an alleged offense against the Commonwealth, and correctly ruled that "in a charge of conspiracy to cheat and defraud, all things connected with the forming of that agreement, what led up to it and what happened afterwards, are evidence for the jury in determining whether they, in making this agreement, intended to cheat and defraud." The vital question in this case was whether

the insertion of the advertisement, the preliminary representations and negotiations, and the execution of the partnership agreements were ordinary and legitimate transactions incident to a mercantile venture which unfortunately failed; or whether they were merely parts of a scheme, in which both defendants were concerned, to induce inexperienced persons to invest their savings in a business which the defendants never intended should succeed. The Commonwealth, pointing to the multiplicity of incidents, the similarity of the negotiations and agreements, the uniform lack of success in the enterprises and the abrupt manner in which each one terminated, contended that an inference of guilt was the only one which could properly be drawn from the evidence. An examination of the charge convinces us that this question was adequately and impartially submitted to the jury.

Complaint is also made of remarks of the assistant district attorney in characterizing, during the taking of testimony, the acquaintance of one of the witnesses with the defendants as "unfortunate," and in referring to the last witness called as the "last victim." These remarks should not have been made, but the trial judge immediately instructed the jury to pay no attention to them and warned the Commonwealth's representative against a repetition. We are not persuaded that they were sufficient ground for the withdrawal of a juror: Com. v. Beattie, 93 Pa. Superior Ct. 404, 410. The contention that the court erred in excluding evidence of the result of certain proceedings in equity between two of the prosecutors and the defendants is without merit. The evidence was offered for the purpose of showing the bias of the witnesses. Proof of the fact that such proceedings had been instituted was admitted; the result was immaterial to the issue involved on this trial. There was, in our opinion, sufficient evidence to require the submission of the case to the jury and we think the

trial judge was justified in declining to arrest the judgment or grant a new trial. None of the assignments can be sustained.

The judgment is affirmed and the record is remitted to the court below and it is ordered that the appellant appear in that court at such time as he may be there called and that he be by that court committed until he has complied with the sentence or any part of it which had not been performed when the appeal in this case was made a supersedeas.